**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| L.T., *individually, and on behalf of those similarly situated,* | ) Case No. 5:25-cv-2223 |
| | ) |
| Plaintiff, | ) |
| v. | ) **JURY TRIAL DEMANDED** |
| | ) |
| SONDERMIND INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**CLASS ACTION COMPLAINT**

Plaintiff L.T., brings this class action against SonderMind Inc. ("SonderMind" or "Defendant") in her individual capacity and on behalf of all others similarly situated, and alleges the following, upon personal knowledge as to their own actions, her counsel's investigation, and upon information and belief as to all other matters.

**NATURE OF THE ACTION**

1.      This class action lawsuit arises out of SonderMind's unlawful use of third-party tracking technologies by data brokers such as Meta Platforms, Inc. d/b/a Facebook ("Facebook" or "Meta")[1] and Google LLC ("Google") to surreptitiously intercept and disclose its patients' and prospective patients' private and protected communications, including communications concerning highly sensitive information, to third parties without patients' consent.

---

[1] Meta also provides other tracking technologies that give the same or similar tracking functionalities as the Facebook Pixel including, but not limited to, Conversions API and SDKs, however, without the benefit of discovery Plaintiffs do not have the evidence of all the Private Information that Defendant's third-party trackers have been collecting from patients during the relevant time period.

2.     Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace or denial of insurance coverage.[2]

3.     Simply put, if people do not trust that their protected health information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

4.     The need for data privacy, security and transparency is particularly acute when it comes to the rapidly expanding world of digital telehealth providers; of all the information the average internet user shares with technology companies, health data is some of the most extensive, valuable and controversial.[3]

---

[2] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022), https://themarkup.org/pixelhunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites; *see also* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world* (Nov. 16, 2022), https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/.

[3] Protected and highly sensitive medical information collected by telehealth companies includes many categories from intimate details of an individual's conditions, symptoms, diagnoses and treatments to personally identifying information including unique codes which can identify and connect individuals to the collecting entity. *See* Molly Osberg & Dhruv Mehrotral, *The Spooky, Loosely Regulated World of Online Therapy* (Feb. 19, 2020), https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137.

5.      SonderMind is a mental health platform, offering access to psychiatric care and mental health therapy, through both in-person and virtual appointments.[4]

6.      SonderMind mental health services on its online platform include access to virtual therapy appointments and psychiatric care—including initial evaluation, follow-ups, and prescribing medication.[5]

7.      SonderMind owns, maintains and operates a website, available at https://www.sondermind.com/ (the "Website") which contains a patient portal, available at https://client.sondermind.com/dashboard (the "Portal," and together with the Website, the "Web Properties").

8.      SonderMind encourages and requires its patients and prospective patients to use its Web Properties to communicate about their mental health conditions, providers and treatments sought, as well as to schedule appointments, pay their bills, and more.

9.      Unbeknownst to its patients and prospective patients, their communications were intercepted and disclosed to third parties through SonderMind's use of third-party tracking technologies such as the Meta Pixel ("Facebook Pixel" or "Pixel"), as well as Google Analytics, DoubleClick and Google Tag Manager (together with the Facebook Pixel, "Tracking Tools"), third party trackers from Facebook and Google.

10.     By purposely embedding and deploying third party tracking technologies on SondeMind's Web Properties, Defendant engages in the unauthorized disclosure of its patients' highly sensitive protected health information ("PHI") and personally identifiable information

---

[4] *See* https://www.sondermind.com/faqs/.

[5] *See id*.

("PII" and together with PHI, "Private Information") to third parties including, but not limited to, Facebook and Google.[6]

11.    Such disclosures of PHI and PII violate state and federal law.

12.    One of the Tracking Tools SonderMind deployed on its Web Properties, and particularly within its patient portal, is the Facebook Pixel.

13.    The Pixel is a snippet of code that, when embedded on a website, tracks the website visitor's activity on that website and sends that data to a third party – here, to Facebook.[7]

14.    The Pixel tracks and logs the pages a website user visits during a website session, their searches, and other submissions to the website. Indeed, the Pixel is routinely used to target specific individuals by utilizing the data gathered through the Pixel to build profiles for the purpose of future targeting and marketing.

---

[6] While this Complaint focuses on Facebook and Google Tracking Tools, Plaintiffs' counsels' investigation shows that Defendant also chose to install additional third-party trackers on its Web Properties, including those from TikTok (owned by Chinese internet company ByteDance, Inc.) and Bing (Microsoft), as well as "session replay" technology from HotJar. Similarly to Meta and Google, these AdTech companies are also able to link collected health information to specific users and use it for targeted advertising.

[7] Meta also provides other tracking technologies that give the same or similar tracking functionalities as the Pixel including, but not limited to, Conversions API, SDKs, and Audiences. Absent discovery, Plaintiffs are unable to independently confirm whether Defendant installed such tracking technologies on its Web Properties.

Upon information and belief Defendant did install and implement Facebook's Conversions API ("CAPI") on its Web Properties' servers. Unlike the Facebook Pixel which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers. *See* https://revealbot.com/blog/facebook-conversions-api/. Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Facebook Pixel from sending website users' Private Information to Facebook directly.

15.     Google's tracking technologies operate much like the Facebook Pixel, tracking and disclosing to Google a user's communications with a website (even when users are in private browsing mode).[8]

16.     The information SonderMind transmitted to third parties, such as Facebook and Google, without Plaintiff's consent included PHI, which is some of the most personal and sensitive data Plaintiff has.[9]

17.     As a result of Defendant's use of the Tracking Tools, Plaintiff's and Class Members' PHI and PII including, but not limited to, patient status, mental health conditions and symptoms, treatments, therapists or psychiatrists, appointment details, and unique personal identifiers used to link the sensitive web communications to Plaintiff and Class Members, were compromised and disclosed to third parties such as Facebook and Google without authorization or consent.

18.     Defendant installed the Tracking Tools with the intent to collect and disclose users' personal health information for purposes of financial gain, in violation of federal and state laws including the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

---

[8] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 920 (N.D. Cal. 2023). As explained by the Court in *Brown*, Google connects user data to IP addresses; IP addresses have been classified by HHS as personally identifiable information that constitutes one of the 18 HIPAA identifiers of PHI. *See* 45 C.F.R. § 164.514 (2).

[9] Under HIPAA, "health information" is defined as "any information[], whether oral or recorded in any form or medium, that . . . [i]s created or received by a health care provider . . . and [r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Additionally, HIPAA defines "health care" as "care, services, or supplies related to the health of an individual" and includes, but is not limited to, the "[s]ale or dispensing of drug, device, equipment, or other item in accordance with a prescription." *Id.*

19.     Plaintiff and Class Members never consented to, authorized, or otherwise agreed to allow Defendant to disclose their PHI and PII to anyone other than those reasonably believed to be part of SonderMind, acting in some healthcare-related capacity. Despite this, Defendant knowingly and intentionally disclosed Plaintiff's and Class Members' PHI and PII to Meta, Google, and other third parties.

20.     Given the nature of Facebook and Google's businesses as two of the world's largest online advertising companies, Plaintiff's and Class Members' PHI and PII can and will likely be further used by or exposed to additional third parties.

21.     As a direct and proximate result of Defendant's unauthorized exposure of Plaintiff's and Class Members' PHI and PII, Plaintiff and Class Members have suffered injury, including an invasion of privacy, loss of the benefit of the bargain Plaintiff and Class Members considered at the time they bargained for healthcare services and agreed to use Defendant's Web Properties for services, statutory damages, and the continued and ongoing risk to their PHI and PII.

22.     Plaintiff brings this action individually on behalf of herself, and on behalf of a Class of similarly situated individuals, to recover for harms suffered and asserts the following claims: (i) Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; (ii) Negligence; (iii) Breach of Express Contract; (iv) Breach of Implied Contract; (v) Breach of Fiduciary Duty; (vi) Bailment; and (vii) *Biddle*.

## PARTIES

23.     Plaintiff L.T. is, and at all relevant times was, an individual residing in Stark County in the State of Ohio.

24.     Defendant SonderMind Inc. is a mental health organization incorporated in Delaware and headquartered at 1099 18th Street, Suite 2350 in Denver, Colorado 80202.

23.     SonderMind is a health care provider and a covered entity under HIPAA.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, including ECPA, 18 U.S.C. § 2511, *et seq.*

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

26.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendant.

27.     This Court has personal jurisdiction over Defendant because SonderMind has transacted business in Ohio and caused tortious injury in Ohio. SonderMind has substantial contacts with Ohio, and the claims of Plaintiff and the Class arise from those contacts. It would be fair and reasonable for the Court to exercise jurisdiction over SonderMind under the circumstances.

28.     Venue is proper under 28 U.S.C. §§ 1391(b)(2)-(3) because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District, including Plaintiff's injury, and Defendant is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

A.     FEDERAL REGULATORS HAVE WARNED HEALTHCARE PROVIDERS ABOUT THE IMPERMISSIBLE USE OF TRACKING TECHNOLOGIES.

29.     The surreptitious collection and disclosure of PHI and PII is a serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the U.S. Department of Health

and Human Services ("HHS") have reiterated the necessity for data security and privacy concerning health information.

30.     For example, the FTC published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health ***make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information***."[10]

31.     The FTC informs companies that provide healthcare services that they should not use "behind-the-scenes" tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent.[11]

32.     Further, the HHS affirmed that HIPAA and its regulations prohibit the transmission of individually identifiable health information ("IIHI") by tracking technology like the Facebook Pixel or Google Analytics without the patient's authorization and other protections like a business associate agreement with the recipient of patient data.[12]

---

[10] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.
[11] *Id.* (emphasis added).

[12] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."). This guidance was

33.     In July 2023, the FTC and HHS sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of PHI to third parties.[13]

34.     The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."[14]

35.     According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[15]

---

recently vacated in part due to the court finding it in part to be the product of improper rulemaking, and it is cited for reference only until OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024). The Court's Order found only that OCR's guidance regarding covered entities' collection and disclosure to third parties of users' IP addresses while they navigated unauthenticated public webpages ("UPWs") was improper rulemaking. The Order in no way affects or undermines OCR's guidance regarding covered entities disclosing unique personal identifiers, such as Google or Facebook identifiers, to third parties while patients make appointments for particular conditions, pay medical bills or log into (or use) a patient portal. *See id.* at 795, n. 8 (vacating OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document.").

[13]     https://www.ftc.gov/business-guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information.

[14]     https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[15] *Id.*

36.     Despite these clear warnings from federal regulators, Defendant SonderMind embedded Tracking Tools on its Web Properties to secretly track its patients' communications regarding healthcare information and disclose those communications to third parties.

**B.     THE FACEBOOK PIXEL**

23.     Meta describes itself as a "real identity platform,"[16] meaning users are allowed only one account and must share "the name they go by in everyday life."[17]

24.     To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[18]

25.     To bolster its advertising business, Meta surveils user activity both on and off its site, including through a datasets called "Core Audiences" and "Custom Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements[19] and reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[20]

26.     With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities, capturing

---

[16] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-manyusers-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[17] *Community Standards: Account Integrity and Authentic Identity,* Meta, `1`https://transparency.meta.com/policies/community-standards/account-integrity-and-authenticidentity/.

[18] *Sign Up*, https://www.facebook.com/signup.

[19] *Easier, More Effective Ways to Reach the Right People on Facebook,* https://www.facebook.com/business/news/Core-Audiences.

[20] *Ad Targeting, Help Your Ads Find the People Who will Love Your Business*, https://www.facebook.com/business/ads/ad-targeting.

this data by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[21]

27.     Additionally, programs in the Meta's Business Tools suite allow advertisers to collect user data through websites, mobile applications and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

28.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, including that webpage's Universal Resource Locator ("URL") and metadata.[22]

29.     However, Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views, what buttons they click or what appointments they schedule.[23] Companies can even create their own tracking parameters by building a "custom event."[24]

30.     One such Business Tool is the Facebook Pixel which Meta offers to advertisers like Defendant to integrate into their websites. The Facebook Pixel "tracks the people and the types of actions they take."[25]

---

[21]     *Create      a      Customer      List      Custom      Audience*, https://www.facebook.com/business/help/170456843145568; *Create a Website Custom Audience*, https://www.facebook.com/business/help/1474662202748341.

[22]     *See Meta Pixel Guide: Advanced*, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also Best Practices for Facebook Pixel Setup*, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; *App Events API*, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[23]     *Specifications      for      Facebook      Pixel      Standard      Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[24]     *About      Standard      and      Custom      Website      Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*

[25] *Retargeting*, https://www.facebook.com/business/goals/retargeting.

31.    According to Meta, the Pixel is tracking code that allows Defendant to measure the effectiveness of [its] advertising by understanding the actions [website visitors] take on [its] website."[26]

32.    Thus, by secretly recording and transmitting data to Meta—without the user's knowledge or consent—the Pixel acts much like a traditional wiretap controlled by Defendant.

33.    When a user accesses a website hosting the Facebook Pixel, Meta's software surreptitiously directs the user's browser to simultaneously send a separate message to Meta's servers.

34.    This second, secret transmission contains the original GET request[27] sent to the host website, along with additional data that the Pixel is configured to collect.

35.     This transmission is initiated by Meta code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and a website: the website's own code and Meta's embedded code.

36.    An example illustrates the point. Take an individual who navigates to the Website and clicks on a button to access their patient account by clicking "Log in." Once that button is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.

37.    Because Defendant utilizes the Facebook Pixel, Meta's embedded code sends secret instructions back to the individual's browser, without alerting the individual that this is

---

[26] *About Meta Pixel*, Meta Business Help Center, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[27] GET requests are one of the most common types of HTTP Requests. An HTTP Request is an electronic communication a website visitor sends from his device's browser to the website's server. In addition to specifying a particular URL (i.e., web address), GET requests can also send data to the host server embedded inside the URL, and can include cookies.

happening, to send information from the Website to Meta including data disclosing that the user in question is a patient attempting to log into their account with SonderMind.[28]

38.     Patients' and prospective patients' communications with the SonderMind Web Properties are transmitted to Meta together with cookies and other unique identifiers that Meta uses to match the communications to individuals who have a Facebook account, including the c_user ID cookie which contains the user's unique Facebook ID.

39.     The Meta Business Tools Terms require websites to "provide[] robust and sufficiently prominent notice to users . . . on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Meta, may . . . collect or receive information from your websites and elsewhere on the Internet and use that information to . . . deliver ads, (b) how users can opt out of the collection and use of information . . . and (c) where a user can access a mechanism for exercising such choice[.]"[29]

40.     Even with these protocols in place, Meta prohibits the disclosure of Business Tools Data "that you know or reasonably should know . . . includes health, financial information or other

---

[28] In addition to the Facebook Pixel, upon information and good faith belief Defendant also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its servers. Facebook recommends to website developers that they install CAPI because it "works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/. Because CAPI is located on the website owner's servers and is not a bug planted onto the website User's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the User that would prevent the Pixel from sending website users' data and communications to Facebook directly. CAPI links collected data points to a "to a dataset ID and [they] are processed like events sent using the Meta Pixel." *Conversions API*, https://developers.facebook.com/docs/marketing-api/conversions-api.

[29] *Meta Business Tools Terms*, § 3(c)(i), https://www.facebook.com/legal/technology_terms.

categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[30]

41. Through its Business Tools suite, Meta has the capability to use the information collected by the Pixel and CAPI for purposes other than simply providing a recording to Defendant including but not limited to: its own contact information matching, measurement and analytics services, ad targeting, commercial and transactional messages, ad delivery improvement, feature and content personalization, and product improvement, provision, and security.

42. Meta stores this data on its own servers, in some instances for years on end, and independently uses the data for its own financial gain by selling it to fourth parties.

43. This data is associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account (or has been logged in recently) when the user visits Defendant's Web Properties, Meta receives several cookies allowing Meta to link the data collected by the Pixel to the specific Facebook user.

44. In other words, a user's personal and private information sent by the Facebook Pixel to Facebook is sent alongside that user's personal identifiers, including IP address and unique cookie values, which can be linked to the user's unique Facebook account.

45. Meta accomplishes this by placing cookies in the web browsers of users who recently logged into their services, which aids Meta in identifying users.

46. One such example is the "c_user" cookie, which is a third-party cookie assigned to each person with a Facebook account. The "c_user" cookie contains a numerical value known as the Facebook ID that uniquely identifies a Facebook user. It is composed of a unique and persistent set of numbers.

---

[30] *Id.*, § 1(h).

47.     A user's Facebook ID is linked to their Facebook profile, which contains a wide range of demographic and other information about the user including pictures, personal interests, work history, relationship status, and other details.

48.     Because a user's Facebook ID uniquely identifies their Facebook account, Meta—or any ordinary person—can use the Facebook ID to locate, access, and view the user's corresponding Facebook profile.

49.     Thus, when a Facebook user visits Defendant's Website while logged in to their Facebook account, the Pixel transmits the user's private web communications with Defendant along with the "c_user" cookie. Meta can then use this information to match the web communications with the user's Facebook ID.

50.     Even if a user does not have a Facebook account or is not logged in to Facebook when browsing Defendant's Website, the Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie, which is transmitted as first-party cookie.

51.     Meta can then use that unique identifier to link the user's web communications with the user's Facebook ID. And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via the Pixel and "_fbp" cookie to the newly created account.[31]

52.     Meta's Business Tools Terms make clear that the Pixel is meant to "match the Contact Information" of users "against user IDs . . . as well as to combine those user IDs with

---

[31] Research indicates that Facebook collects and stores information even on individuals who never signed up for a Facebook account, in so-called "shadow profiles." *See* Russell Brandom, *Shadow Profiles Are the Biggest Flaw In Facebook's Privacy Defense*, (Apr 11, 2018), https://www.theverge.com/2018/4/11/17225482/facebook-shadow-profileszuckerberg-congress-data-privacy

corresponding Event Data."[32]

53.     After Meta processes users' intercepted information, it makes the relevant analytics available to SonderMind through Meta's Event Manager tool.

54.     The Pixel also allows a healthcare company, like Defendant, to impact the delivery of ads, measure cross-device conversions, create custom audiences, and save money on advertising and marketing costs.[33]

55.     But, most relevant here, the Pixel allowed Defendant and Meta to track users secretly on Defendant's Web Properties, intercept their communications about highly sensitive personal mental health-related topics with Defendant and disclose these communications to Meta.

56.     The PHI intercepted, recorded, and transmitted to Meta by SonderMind includes, but is not limited to, patient status, patient location, mental health conditions, treatments sought, appointment details, and providers and locations sought.

57.     In sum, the Pixel allows Meta to learn, manipulate, and use for financial gain, the medical and private content Defendant's Web Properties visitors communicated, viewed, or otherwise interacted with on Defendant's Web Properties.

58.     Transmission of users' data and communications only occurs on webpages that contain the Pixel. Thus, Plaintiff's and Class Members' PHI and PII would not have been disclosed to Meta but for Defendant's decision to install the Pixel on its Web Properties.

---

[32]     *Meta       Business       Tool       Terms,       Section       2(a)(i)(1)*, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1 zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr.

[33]*Meta Pixel,* https://www.facebook.com/business/tools/meta-pixel?ref=search_new_2.

C.      GOOGLE TRACKING CODE.

59.     Alphabet Inc., the parent holding company of Google, generates revenues primarily by delivering targeted online advertising through Google, which is the creator of the Google Source Code and an established advertising company.

60.     Like Meta, Google creates code that website developers can install on their websites to track user activity. Whenever a user visits a website that is running Google tracking code, Google's code directs the user's browser to send a separate and concurrent communication to Google without the user's knowledge.

61.     The information that is intercepted and transmitted to Google via the Google tracking code includes: (i) the URL of the specific webpage a user is trying to access; (ii) the user's IP address; (iii) the User-agent, which identifies the user's device platform and browser; (iv) the user's geolocation, if available; (v) the Referrer, which is the URL of the page on which the user clicked a link to access a new page; (vi) event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and (vii) actual search queries on the site.

62.     Google tracking code tells Google exactly what a user's browser communicated to the website.

63.     Like with the Facebook Pixel, the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

64.     Information sent to Google is sent alongside the users' unique identifier ( such as the "CID" cookie from Google Analytics and DSID or IDE cookies from DoubleClick), thereby allowing individual patients' communications with SonderMind, and the PHI and PII contained

17

in those communications, to be linked to their unique Google accounts and therefore their identity.[34]

65.    Similar to the way that Facebook's _fbp cookie operates, Google Analytics also uses certain "first-party" cookies like _ga and _gid to track users' activities on non-Google websites.

66.    After tracking, intercepting, and acquiring user's information, Google uses the information for serving personalized ads.

67.    Like Meta, Google is therefore able to monetize the information surreptitiously intercepted, with SonderMind's help, from visitors to Defendant's Web Properties.

**D.    SONDERMIND DEPLOYS THIRD-PARTY TRACKING TOOLS TO INTERCEPT AND DISCLOSE PHI AND PII.**

68.    The Tracking Tools SonderMind chose to install on its Web Properties begin collecting users' PHI from the moment they start navigating the Website.

69.    For example, Google Tracking Tools capture and disclose visitors' PHI and the actions visitors take on the Website prior to creating an account (including the exact text of buttons clicked by the visitor).

70.    If a user clicks on Defendant's "Explore Services" tab and clicks on "Psychiatry," they get taken to the webpage https://www.sondermind.com/psychiatry/, displayed to the user as shown in *Figure 1* below:

---

[34] *See Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. 2023) (quoting Google employee deposition testimony explaining how Google tracks user data).



71.     What the user does not see is that Google trackers hidden in the Website "source code" capture their action and disclose it to Google, effectively disclosing that the user is looking for psychiatric services,[35] *see Figure 2*:

---

[35] "Source code" is essentially the blueprint of a software program that tells the computer what to do. *See* Lenovo, *Glossary, Source code,* https://www.lenovo.com/us/en/glossary/source-code/?orgRef=https%253A%252F%252Fwww.google.com%252F&srsltid=AfmBOop8lBXxenP-Tf40vuticaTUJGY_BwC5xdD3zJ8dG4cXMjUkcrSt

72.   Furthermore, Google Tracking Tools capture and disclose to Google when a user

starts the registration process for SonderMind's services including the type of mental health

treatment the user is seeking, and the steps they take during the process.[36] *See Figure 3* below:

---

[36] This information is also captured by third party trackers from TikTok and by session replay technology from HotJar, which captures the user's behavior on a webpage including every mouse click and keystroke.



73.     All of the private information that constitutes PHI is transmitted to Facebook and Google with unique identifiers used to link the communication to a specific Facebook or Google user.

74.     Most disturbingly, SonderMind chose to install Tracking Tools on the log-in page and *__inside its patient portal__* part of its Website.

75.     As the user completes their registration process with SonderMind and sets up a patient account, this information is also captured and disclosed to unauthorized third parties, including Facebook, Google and Tiktok. *See, e.g.*, the images below:



*Figure 4: Depiction of a custom "CompleteRegistration" event SonderMind chose to set up its Facebook Pixel to capture, disclosing that the user has signed up as Defendant's patient.*



*Figure 5: Depiction of one of many 'events' captured by the TikTok trackers on SonderMind's Web Properties disclosing that every step that that user takes, including having signed up as Defendant's patient.*

76.     Then, when a patient logs in (for example, to schedule an appointment or check messages from providers in their SonderMind patient "dashboard" available at

22

https://client.sondermind.com/chat/rooms), these private communications are disclosed to Facebook and Google as well.

77.     These transmissions include the substantive description and disclosure of the user's status as a "client" (i.e. a patient, of SonderMind), the fact that they took steps to reach this page and the user's unique identifiers assigned to them by Facebook and Google that these AdTech companies use to link the PHI to the user's Facebook or Google accounts in order to serve them targeted advertising.

78.     Thus, the fact that a patient or prospective patient is using SonderMind for mental health services is transmitted to Facebook and Google, as demonstrated in *Figures 6-8* below:







79.     In each of the examples above, the user's website activity and the contents of the user's communications are sent to Facebook and Google alongside their personally identifiable information.

80.     For example, the Facebook Pixel collects and transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

81.     Facebook receives several cookies when SonderMind's Web Properties transmit information via the Pixel, including the c_user, datr, and fr cookies, *see Figure 9* below:



82.     The "datr" cookie contains a unique alphanumeric code and identifies the specific web browser from which the user is sending the communication. It is an identifier that is unique to the user's web browser and is therefore a means of identification for Meta. Meta keeps a record of every datr cookie identifier associated with each of its users.

83.     The fr cookie, a unique combination of the c_user and datr cookies, contains an encrypted Facebook ID and browser identifier.[37] Facebook, at a minimum, uses the fr cookie to

---

[37] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit*, p. 33 (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.[38]

84.     The datr and fr cookies are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.

85.     Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout the SonderMind Web Properties.

86.     Defendant also revealed the Web Properties visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user.

87.     The _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with SonderMind's use of the Facebook Meta Pixel program. The _fbp cookie emanates from Defendant's Website as a putative first party cookie, but is transmitted to Facebook through cookie synching technology that hacks around the same-origin policy. Therefore, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies.

88.     The __ga and _gid cookies operate similarly as to Google and are sent to Google by Google Tracking Tools installed by Defendant on its Web Properties.

89.     The Facebook Pixel uses both first- and third-party cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies,

---

[38] *Cookies & other storage technologies*, https://www.facebook.com/policy/cookies/.

customers' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

90.     As demonstrated above, Google Tracking Tools installed on the SonderMind Website also collect sensitive PHI and PII from Defendant's patients.

91.     This information is shared with Google along with the CID, IDE,_DSID,_ga and _gid cookies.

92.     Based on the above examples of how the Tracking Tools operate on SonderMind's Website, Facebook and Google would know (i) that a particular individual—who Facebook and Google can identify based on their respective accounts—was a patient or prospective patient of SonderMind seeking healthcare services, (ii) that the named patient searched for (or selected from "services") information regarding their specific medical condition (for example, "psychiatry"), and (iii) that the patient in question was attempting to sign up for health services.

93.     Facebook and Google would also know the named patient's location and IP address, among other identifiers associated with the patient's computer or cell phone.

94.     Using this PHI and PII, technology companies can put the named patient into a Core or Custom Audience for purposes of targeted advertising by SonderMind or any other company seeking to advertise its services or products to individuals that fit the named patient's profile.

95.     SonderMind, Meta, Google, and other third parties profit off of Plaintiff's and Class Members' PHI and PII without their knowledge, consent, or authorization.

96.     Defendant deprived Plaintiff and Class Members of their privacy rights when it: (a) embedded and implemented the Tracking Tools, which surreptitiously intercepted, recorded, and disclosed Plaintiff's and other online patients' and prospective patients' confidential

communications and private information; (b) disclosed patients' and prospective patients' protected information to Facebook and Google—unauthorized third parties; and (c) failed to provide notice to or obtain the consent from Plaintiff and Class Members to share their PHI and PII with others.

**E.  REPRESENTATIVE PLAINTIFF L.T.'S EXPERIENCES.**

97.     Plaintiff L.T. accessed and used Defendant's Website through her mobile device to receive healthcare services from Defendant and at Defendant's direction.

98.      Plaintiff began using Defendant's services since approximately September 2021 and used Defendant's Website to schedule appointments for mental health therapy.

99.     As a condition of receiving Defendant's services, Plaintiff L.T. provided her PII and PHI, including her birthdate, mental health conditions, and mental health care sought, to Defendant to create an account to receive therapy services.

100.    Plaintiff L.T. has had an active Facebook account and an active Google account during the time she was providing her PHI and PII to Defendant via its Website.

101.    Upon information and good faith belief, Plaintiff L.T. began receiving targeted advertisements related to her treatment by Defendant after she provided information to Defendant with her PHI and PII.

102.    Plaintiff L.T. reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by any third party without her full knowledge and informed consent.

103.    Plaintiff L.T. provided her PHI and PII to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

104.    As described herein, Defendant worked along with Facebook and Google to intercept Plaintiff L.T.'s communications, including those that contained confidential PHI and PII.

105.    Defendant willfully facilitated these interceptions without Plaintiff's knowledge, consent or express written authorization.

106.    Defendant transmitted Plaintiff's Facebook ID, unique Google identifiers, location, information such as her registering for services, her patient status, and her other sensitive and private medical information to Facebook and Google.

107.    The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to third party data brokers can only be determined through formal discovery.

108.    However, Defendant intercepted at least communications about Plaintiff's past or present patient status via descriptive long-URLs, microdata and the inner text of buttons clicked by Plaintiff on the Website and Patient Portal that were sent to Facebook and Google via the Tracking Tools and which contained information concerning Plaintiff's specific medical conditions, queries, and treatments sought.

109.    By doing so without her consent, Defendant violated Plaintiff's privacy and unlawfully disclosed her PHI and PII.

110.    Defendant did not inform Plaintiff that it shared her PHI and PII with Facebook and Google.

111.    Plaintiff would not have utilized Defendant's medical services or used its Web Properties or would have paid much less for Defendant's services had she known that her PII and PHI would be captured and disclosed to third parties like Facebook and Google without her consent.

112. Plaintiff suffered damages in, inter alia, the form of (i) violation of confidentiality of her PHI and PII; (ii) loss of benefit of the bargain; (iii) diminution of value of her PHI and PII; (iv) statutory damages and (v) the continued and ongoing risk to her PHI and PII.

113. Plaintiff has a continuing interest in ensuring that her PHI and PII is protected and safeguarded from future unauthorized disclosure. Plaintiff wants to continue to communicate through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Facebook or Google and thus continues to be at risk of harm from Defendant's conduct.

**F.    SONDERMIND'S CONDUCT VIOLATES ITS OWN PRIVACY POLICIES AND PROMISES.**

114. Defendant's privacy policies represent to Plaintiff and Class Members that Defendant will keep PHI and PII private and confidential and SonderMind will only disclose PHI under certain circumstances, none of which apply here.

115. For matters concerning "health information" (PHI), SonderMind's *Privacy Policy* (https://www.sondermind.com/privacy-policy/) directs users to Defendant's *Notice of Privacy Practices* (https://www.sondermind.com/notice-of-privacy-practices/).

116. SonderMind's Notice of Privacy Practices explains Defendant's legal duties with respect to PHI and PII and the exceptions for when Defendant can lawfully use and disclose it.

117. Defendant's Notice of Privacy Practices states that "[w]e will never sell your identifiable health information to a third party. Period. Our Promise."[39]

---

[39] *Notice of Privacy Practices*, https://www.sondermind.com/notice-of-privacy-practices/.

118.    Defendant's Notice of Privacy Practices also provides that "[u]nless a use or disclosure is permitted or required by law, we will obtain your written consent or authorization prior to using or disclosing your highly confidential health information to third parties."[40]

119.    Defendant also recognizes that information relating to someone's mental health or psychotherapy services is highly confidential health information that should not be disclosed without patients' written consent:

> **Uses and Disclosures of Your Highly Confidential Information**.  Some federal and/or state laws require special privacy protections for certain highly confidential health information, relating to: (1) psychotherapy services; (2) mental health and developmental disabilities services; (3) substance use disorder diagnosis, treatment and referral; (4) HIV/AIDS testing, diagnosis or treatment; (5) venereal disease(s); (6) genetic testing; (7) child abuse and neglect; (8) domestic abuse of an adult with a disability; and/or (9) sexual assault. Unless a use or disclosure is permitted or required by law, we will obtain your written consent or authorization prior to using or disclosing your highly confidential health information to third parties.[41]

120.    At no point did Defendant seek such authorization from Plaintiff before transmitting PHI to a third party for marketing purposes.

121.    Defendant violated its own Privacy Policy and Notice of Privacy Practices by unlawfully disclosing Plaintiff's and Class Members' PII and PHI to Meta (Facebook), Google, and likely other third parties without written authorization.

122.    This language reflects Defendant's awareness of the high value patients such as Plaintiff and Class Members place on their PHI.

123.    Defendant's transmission of protected health information to third parties such as Facebook and Google violated its own Notice of Privacy Practices, in which Defendant

---

[40] *Id.*

[41] *Id.*

acknowledges that "[e]xcept as otherwise provided in this Notice, we will not use or disclose your health information without your prior written authorization."[42]

124.    SonderMind's examples of how and where it collects PHI and PII do not include patients' appointment details, specific medical conditions, and status as a patient.[43]

125.    Defendant's Privacy Policy and Notice of Privacy Practices do not permit Defendant to intercept, transmit, or disclose Plaintiff's and Class Members' PHI and PII to third parties, including Meta, for marketing purposes.[44]

126.    Defendant violated its own privacy policies by unlawfully intercepting and disclosing Plaintiff's and Class Members' PHI and PII to Meta and other third parties without adequately disclosing that it shares such information with third parties and without acquiring the specific patients' consent or authorization to share it.

**G.    EXPOSURE OF PHI AND PII CREATES A SUBSTANTIAL RISK OF HARM.**

127.    The FTC has recognized that consumer data is a lucrative and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[45]

---

[42] https://www.sondermind.com/notice-of-privacy-practices/.

[43] *Id.*

[44] *See id.*; *see also* https://www.sondermind.com/privacy-policy/

[45] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, at 2 (Dec. 7, 2009) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

128.    The FTC also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require, among other things: (i) using industry tested and accepted methods; (ii) monitoring activity on networks to uncover unapproved activity; (iii) verifying that privacy and security features function properly; and (iv) testing for common vulnerabilities or unauthorized disclosures.[46]

129.    The FTC cautions businesses that failure to protect PHI and PII and the resulting privacy breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[47] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

## H.    PLAINTIFF'S AND CLASS MEMBERS' PHI AND PII IS VALUABLE.

130.    As many health care data industry experts have recognized, "[p]atients' medical data constitutes a cornerstone of the big data economy. A multi-billion dollar industry operates by collecting, merging, analyzing[,] and packaging patient data and selling it to the highest bidder."[48]

---

[46] *Start With Security, A Guide for Business,* https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

[47] *See Taking Charge: What to Do if Your Identity is Stolen*, FTC, at 2 (2012), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf.

[48] Niam Yaraghi, *Who should profit from the sale of patient data?,* The Brookings Institution (Nov. 19, 2018), https://www.brookings.edu/blog/techtank/2018/11/19/who-should-profit-from-the-sale-of-patient-data/.

131.    The personal health information of Plaintiff and Class Members is valuable and has become a highly desirable commodity. One of the world's most valuable resources is the exchange of personal data.[49]

132.    Defendant and vendors of the Tracking Tools that Defendant uses profit from their use of Plaintiff's and Class Members' PII and PHI to target them with advertising and for other economic benefits, such as improving their internal operations.

133.    The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[50]

134.    A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[51] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

135.    Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data)

---

[49] *The world's most valuable resource is no longer oil, but data* (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[50] *Id.*

[51] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

from consumers.[52] Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[53]

136.    The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success. Research shows that organizations who "leverage customer behavioral insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[54]

137.    Unlike financial information, such as credit card and bank account numbers, PHI and certain PII cannot be easily changed. Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life. Medical histories are inflexible. For these reasons, these types of information are the most lucrative and valuable.[55]

138.    Consumers place considerable value on their PHI and PII and the privacy of that information.

---

[52] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)* (Aug. 5, 2022; updated May 30, 2023), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[53] *Id.*

[54] Brad Brown, *et al.*, *Capturing value from your customer data* (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[55] *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters (July 21, 2020), https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/.

139.    Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[56]

140.    CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[57]

141.    In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[58]

142.    In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

143.    Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of

---

[56] *See* https://time.com/4588104/medical-data-industry/.

[57] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[58] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM, at 166 (2019).

consumer information.[59]

144.    Likewise, in The Wall Street Journal, former fellow at the Open Society Institute and principal technologist at the ACLU (and currently Senator Ron Wyden's Senior Advisor for Privacy & Cybersecurity) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[60]

145.    The cash value of the personal user information unlawfully collected by Defendant provided during the Class Period can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[61] Web browsing histories were valued at $52.00 per year.

146.    Similarly, the value of user-correlated internet browsing history can be quantified, because Google was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add

---

[59] Paul M. Schwartz, Property, *Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).

[60] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

[61] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html.

a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the enormous value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

147.    User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

148.    Marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[62]

---

[62]    VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/.

38

149. Several companies have products through which they pay consumers for a license to track their data. For example, Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect pay for browsing historical information.

150. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages of 13 and 35.

151. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[63]

152. Defendant's privacy violations exposed a variety of PHI including patient status, health conditions and symptoms, physicians, and other highly sensitive data.

153. PHI, like that exposed here, is likely even more valuable than Social Security numbers and just as capable of being misused.[64] PHI can be ten times more valuable than credit card information.[65] This is because one's personal health history, including prior illness, surgeries, diagnoses, mental health, prescriptions, and the like cannot be changed or replaced, unlike credit card information and even, under difficult circumstances, Social Security numbers.[66]

---

[63] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

[64] *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI (April 8, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/#:~:text=(U)%20Cyber%20actors%20will%20likely,records%20in%20the%20black%20market.

[65] Tim Greene, *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers*, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[66] *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

154.    Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[67] "Rapid digitization of health records . . . have positioned hospitals as a primary arbiter of how much sensitive data is shared."[68]

155.    The United States Supreme Court has explained that "Confidential business information has long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26 (1987). "Depriv[ation] of [the] right to exclusive use of … information" causes a loss of property "for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id*. at 27. There is no doubt that Defendant has a "property right" in patients' data such that, if Facebook or Google took such information from Defendant without authorization, Defendant would have a claim for Facebook's or Google's taking of their property. Patients also have a property right in their own health information that may not be taken or used by Defendant without their authorization for non-health care related reasons.

I.    PLAINTIFF AND CLASS MEMBERS HAD A REASONABLE EXPECTATION OF PRIVACY IN THEIR INTERACTIONS WITH DEFENDANT'S WEB PROPERTIES.

156.    Consumers assume the data they provide to healthcare providers will be kept secure and private.

157.    In a survey related to Internet user expectations, most website visitors indicated that their detailed interactions with a website should only be used by the website and not be shared

---

[67] Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records* (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200.

[68] *Id.*

with a party they know nothing about.[69] Website visitors expect that their interactions with a website should not be released to third parties unless explicitly stated.[70]

158.    The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its' customers' data.[71] A March 2000 BusinessWeek/Harris Poll found that 89 percent of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[72] The same poll found that 63 percent of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[73] A July 2000 USA Weekend Poll showed that 65 percent of respondents thought that tracking computer use was an invasion of privacy.[74]

159.    Patients and website users act consistently with their expectation of privacy. For example, following a new rollout of the iPhone operating software—which asks users for clear,

---

[69] *See Privacy and Online Tracking Perceptions Survey Report* (March 2020), CUJOAI, at 15–19, Privacy Survey_03-24 (cujo.com) (indicating major concerns of survey respondents was illegal use of data and unethical tracking and indicating respondents' belief that responsibility allocation falls on websites, and Internet users should be able to turn to the websites themselves, for privacy breaches).

[70] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, THE INFORMATION SOCIETY, 38:4, 257, 258 (2022).

[71] *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/.

[72] *Id.*

[73] *Id.*

[74] *Id.*

affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[75]

160.    Like the greater population, Defendant's patients and prospective patients would expect the highly sensitive medical information they provided to Defendant through the Website to be kept secure and private.

**J.    SONDERMIND'S CONDUCT VIOLATES HIPAA.**

161.    Under HIPAA, individuals' health information must be:

properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being. The [Privacy] Rule strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing.[76]

162.    HIPAA "is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge."[77] The rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.

163.    HIPAA defines PHI as "individually identifiable health information" that is "created or received by a health care provider" (or similar entities) that "[r]elates to past, present, or future physical or mental health or condition of an individual; the provision of health care to an

---

[75]    Margaret Taylor, *How Apple screwed Facebook* (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[76]    *Summary of the HIPAA Privacy Rule* (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

[77]    *Health Insurance Portability and Accountability Act of 1996 (HIPAA)* (June 27, 2022), https://www.cdc.gov/phlp/publications/topic/ hipaa.html#:~:text=Health%20Insurance%20Portability%20and%20Accountability%20Act%20 of%201996%20(HIPAA),-On%20This%20Page&text=The%20Health%20Insurance%20 Portability%20and,the%20patient's%20consent%20or%20knowledge.

individual; or the past, present, or future payment for the provision of health care to an individual."
45 C.F.R. § 160.103.

164.    Identifiers such as patient-status (i.e., information that connects a particular user to a particular health care provider), medical conditions, mental health symptoms, treatments, and providers, gathered in this case by the Tracking Tools through SonderMind's Website, constitute protected health information.

165.    To ensure protection of this private and sensitive information, HIPAA mandates standards for handling PHI—the very data Defendant failed to protect.

166.    When a regulated entity, like Defendant, collects the individual's information, that information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health, health care, or payment for care.

167.    When Plaintiff communicated with SonderMind regarding treatment options and other health-related information on the SonderMind Website, the Tracking Tools intercepted and disclosed those communications to Facebook and Google in violation of HIPAA's Privacy Rule.

## CLASS ACTION ALLEGATIONS

168.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

169.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the third-party tracking technologies on Defendant's Web Properties.

170.    The Ohio Subclass that Plaintiff seeks to represent is defined as follows:

All individuals residing in the State of Ohio whose Private Information was disclosed to a third party without authorization or consent through the third-party tracking technologies on Defendant's Web Properties.

171.    The Nationwide Class and the Ohio Subclass are referred to herein as the Class.

172.    **The following people are excluded from the Class:** (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors and any entity in which Defendant or its parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's and Defendant's counsel and (6) the legal representatives, successors and assigns of any such excluded persons.

173.    Plaintiff reserves the right under Federal Rule of Civil Procedure 23 to amend or modify the Class to include a broader scope, greater specificity, further division into subclasses, or limitations to particular issues.

174.    All members of the proposed Class are readily identifiable through Defendant's records.

175.    All requirements for class certification under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

176.    **Numerosity**. The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believes that the proposed Classes include tens of thousands of people based on SonderMind's reported patient visits per year. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

177.    **Commonality and Predominance.** This action involves common questions of law and fact to Plaintiff and Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

    a.  Whether Plaintiff's and Class Members' private communications were intercepted, recorded, and disclosed;

    b.  Whether the interception, recording, and disclosure of Plaintiff's and Class Members' communications was consensual;

    c.  Whether Defendant owed Plaintiff and the other Class Members a duty to adequately protect their PHI and PII;

    d.  Whether Defendant owed Plaintiff and the other Class Members a duty to secure their PHI and PII from interception and disclosure via third-party tracking technologies;

    e.  Whether Defendant owed Plaintiff and the other Class Members a duty to implement reasonable data privacy protection measures because Defendant accepted, stored, created, and maintained highly sensitive information concerning Plaintiff and the Classes;

    f.  Whether Defendant knew or should have known of the risk of disclosure of data through third-party tracking technologies;

    g.  Whether Defendant breached its duty to protect the PHI and PII of Plaintiff and the other Class Members;

    h.  Whether Defendant knew or should have known about the inadequacies of its privacy protection;

    i.  Whether Defendant failed to use reasonable care and reasonable methods to safeguard and protect Plaintiff's and the Class Members' PHI and PII from unauthorized disclosure;

    j.  Whether proper data security measures, policies, procedures, and protocols were enacted within Defendant's computer systems to safeguard and protect Plaintiff's and the Class Members' PHI and PII from unauthorized disclosure;

    k.  Whether Defendant's conduct was the proximate cause of Plaintiff's and the Class Members' injuries;

    l.  Whether Plaintiff and Class Members had a reasonable expectation of privacy in their PHI and PII;

     m. Whether Plaintiff and Class Members suffered ascertainable and cognizable injuries as a result of Defendant's misconduct;

     n. Whether Plaintiff and Class Members are entitled to recover damages; and

     o. Whether Plaintiff and Class Members are entitled to other appropriate remedies including injunctive relief.

178. Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of herself and the Class. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

179. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's PHI and PII, like that of every other Class Member, was improperly disclosed by Defendant. Defendant's misconduct impacted all Class Members in a similar manner.

180. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has retained counsel experienced in complex consumer class action litigation and intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Classes.

181. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual patients like

Plaintiff would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

182. Class Certification under Fed. R. Civ. P. 23(b)(2) is also appropriate. Defendant has acted or refused to act on grounds that apply generally to the Class, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiff and the Class remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with injuries similar to Plaintiff's, even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual patients, which would establish potentially incompatible standards of conduct for Defendant, or (b) adjudications with respect to individual patients which would, as a practical matter, be dispositive of the interests of the other patients not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Class. Further, the claims of individual patients in the defined Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## LEGAL CLAIMS

## COUNT I

## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2511(1)
### *(On Behalf of Plaintiff & the Nationwide Class)*

183. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as though fully set forth herein.

184.   The ECPA protects against intentional interception, attempted interception, or the procurement of another person to intercept or attempt to intercept any wire, oral, or electronic communication. *See* 18 U.S.C. § 2511(1)(a).

185.   The ECPA protects both sending and receipt of communications.

186.   The ECPA further provides any person who:

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

*Id.* §§ 2511(1)(c) & (d).

187.   The primary purpose of the ECPA is to protect the privacy and security of communications as technology evolves.

188.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

189.   Section 2520 provides for $10,000 in statutory damages for violations of ECPA. *Id.* § 2520(c)(2)(B).

190.   The ECPA defines "intercept[ion]" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4).

48

191.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." *Id.* § 2510(8).

192.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." *Id*. § 2510(12).

193.    The transmissions of PII and PHI from Plaintiff and Class Members to Defendant through Defendant's Web Properties are "electronic communications" under the ECPA. *See id*. § 2510(12).

194.    The PHI transmitted by Plaintiff and Class Members include, but are not limited to, information regarding patient status, past and current mental health conditions and symptoms, treatment options, and other sensitive information.

195.    Furthermore, Defendant intercepted the "contents" of Plaintiff's and Class Members' communications in at least the following forms:

    a.    The parties to the communications;

    b.    PII such as patients' Facebook IDs, Google user IDs, browser fingerprints and other unique identifiers;

    c.    The precise text of patient communications about specific mental health conditions;

    d.    The precise text of information generated when patients requested or made appointments;

    e.    The precise text of patient communications about specific treatments;

    f.    The precise text of patient communications about scheduling appointments with providers;

g. The precise text of specific buttons on Defendant's Web Properties that patients click to exchange communications including Sign-Ins, Registrations, Requests for Appointments, Services and other buttons;

h. The precise dates and times when patients visit Defendant's Web Properties;

i. Information that is a general summary or informs third parties of the subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific providers, conditions, treatments, billing, payment and other information.

196. For example, Defendant intercepts the fact that a user is a registered client and a patient when a user logs into their patient portal, or when they perform actions in the portal such as viewing messages from providers at https://client.sondermind.com/chat/rooms.

197. Additionally, through its use of the Tracking Tools, Defendant intercepted and disclosed the communications about patient status, health conditions and symptoms, and other PHI and PII Plaintiff and Class Members searched for and disclosed on Defendant's Web Properties. This information was, in turn, used by third parties, such as Facebook and Google, to (i) place Plaintiff and Class Members in specific health-related categories; and (ii) target Plaintiff and Class Members with advertising associated with Plaintiff's and Class Members' particular health conditions. Defendant knowingly transmitted this data and did so for the purpose of financial gain.

198. "Electronic, mechanical or other device" means "any device or apparatus which can be used to intercept . . . electronic communication[s]." *Id.* § 2510(5).

199. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies SonderMind, Meta, and Google use to track Plaintiff's and Class Members' communications;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' computing devices;

d. Defendant's web servers; and

      e.   The Tracking Tools deployed by Defendant to effectuate the sending and acquisition of patient communications.

200.    By embedding and deploying the Tracking Tools on Defendant's Web Properties, Defendant intentionally violated the ECPA, through its interception, attempt at interception, and its procurement of third parties to intercept the electronic communications of Plaintiff and Class Members.

201.    Defendant also intentionally used or attempted to use the contents of Plaintiff's and Class Members' electronic communications, knowing that the information was obtained through interception. Defendant's use of the intercepted information and data for its own advertising and data analytics, in the absence of express written consent, violated ECPA.

202.    Further, by embedding the Tracking Tools on its Web Properties and disclosing the content of patient communications relating to PHI and PII, without consent, Defendant had a purpose that was tortious, criminal, and designed to violate state and federal laws, including:

      a.   Breach of fiduciary duty;

      b.   Criminal violation of HIPAA, 42 U.S.C. § 1320d–6, which protects against the disclosure of IIHI to another person; and

      c.   Violation of Section 5(a) of the FTC Act.

203.    Any party exception in 18 U.S.C. § 2511(2)(d) does not apply. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3).

204.    42 U.S.C. § 1320d-6(a)(3) provides criminal and civil penalties against a healthcare provider who "knowingly . . . discloses individually identifiable health information to another person."

205.    HIPAA defines IIHI as:

any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) *relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual,* or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[78]

206.    HIPAA prohibits disclosing patients' health information via tracking technologies. Defendant's use of the Tracking Tools violates HIPAA because the Facebook Pixel and the other Tracking Tools transmit information that "identifies the individual" or, at a minimum, "there is a reasonable basis to believe that the information can be used to identify the individual," such as through unique identifying cookies and users' IP addresses.

207.  Further, a disclosure that violates HIPAA is a violation of law that is independent of a violation of the ECPA.

208.  Disclosing health information in violation of HIPAA can provide the predicate for a claim under the ECPA when defendant discloses patient personal health information to third parties for financial gain, an act which is distinct from the original improper interception.

209.  The crime-tort exception under the ECPA does not require a criminal or tortious purpose; it requires only a purpose of committing an act – an act that is criminal or tortious.

210.  If, at the time of the recording, the offender plans to use the recording to harm the

---

[78] U.S.C. § 1320d(6) (emphasis added).

other party to the conversation, a civil cause of action exists under the ECPA.

211.  SonderMind acted with the intent to commit a tort separate and distinct from the use of third party tracking tools on its Web Properties, evidenced, for example, by the fact that Defendant could have used tracking technologies from HIPAA-compliant analytics companies or have requested patient consent to collection and disclosure of their IIHI.

212.  Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific patients without patient authorization and disclosed IIHI to Facebook and Google without patient authorization.

213.  The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

214.  Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

215.  As described above, Plaintiff and Class Members entered sensitive private data on Defendant's Web Properties relating to personal health conditions and other IIHI. Through the Tracking Tools employed, Defendant disclosed the IIHI of its Web Properties visitors to third parties in violation of the ECPA.

216.  Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in learning that:

   a.  Defendant intruded upon, intercepted, transmitted, shared, and used their IIHI (including information about mental health conditions, therapy appointments, therapists, and treatments) for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' IIHI without providing any value or benefit to Plaintiff or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff and Class Members' IIHI, such as understanding how patients and prospective patients use its Web Properties and determining what ads people see on its Web Properties, without providing any value or benefit to Plaintiff or Class Members;

d. Defendant failed to provide Plaintiff and Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of its patient information, and

e. The diminution in value of Plaintiff's and Class Members' IIHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, medical conditions and symptoms, medical treatment and appointments that Plaintiff and Class Members intended to remain private no longer private.

217. Patients have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that caused third-party cookies (including but not limited to the _fbp, _ga and _gid cookies) and other tracking technologies to be deposited on Plaintiff's and Class Members' computing devices as "first-party" cookies that are not blocked.

218. Defendant's scheme or artifice to defraud in this action consists of:

a. the false and misleading statements and omissions in its privacy policy set forth above, including the statements and omissions recited in the claims below; and

b. the placement of the _fbp, _ga and _gid cookies on patient computing devices disguised as first-party cookies on Defendant's Website rather than a third-party cookies from Facebook and Google.

219. At no time did Plaintiff or Class Members consent to Defendant's disclosure of their IIHI to Meta, Google, or other third parties. Plaintiff and the Class had a reasonable

expectation that Defendant would not re-direct their communications content to Meta, Google, or others attached to their personal identifiers in the absence of their knowledge or consent.

220.    Any purported consent that Defendant received was not valid.

221.    Defendant has improperly profited from its invasion of Plaintiff's and Class Members' privacy in its use of their data for its economic value.

222.    Defendant knew that such conduct would be highly offensive. Regardless, it proceeded to embed the Tracking Tools and use them to the detriment of its Web Properties' users including Plaintiff and Class Members.

223.    As a result of Defendant's violation of the ECPA, Plaintiff and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages and attorney's fees and costs.

## COUNT II

### BREACH OF EXPRESS CONTRACT
### *(On behalf of Plaintiff & the Nationwide Class)*

224.    Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

225.    Plaintiff and Class Members allege they entered into valid and enforceable express contracts or were third-party beneficiaries of valid and enforceable express contracts, with Defendant for the provision of mental health services.

226.    Specifically, Plaintiff and Class Members entered into a valid and enforceable express contract with Defendant when Plaintiff and Class Members first received medical care from Defendant.

227.    The valid and enforceable express contracts to provide health care services that Plaintiff and Class Members entered into with Defendant include Defendant's promise to protect nonpublic PII and PHI given to Defendant or that Defendant gathers on its own, from disclosure.

228.    Under these express contracts, Defendant and its affiliated healthcare providers, promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' PII and PHI: (i) provided to obtain such healthcare or (ii) created as a result of providing such healthcare. In exchange, Plaintiff and Members of the Class agreed to pay money for these services, and to turn over their PII and PHI.

229.    Both the provision of medical services and the protection of Plaintiff and Class Members' PII and PHI were material aspects of these express contracts.

230.    The express contracts for the provision of medical services – contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' PII and PHI— are formed and embodied in multiple documents, including (among other documents) Defendant's Notice of Privacy Practices.

231.    At all relevant times, Defendant expressly represented in its Notice of Privacy Practices, among other things that "[u]nless a use or disclosure is permitted or required by law, we will obtain your written consent or authorization prior to using or disclosing your highly confidential health information to third parties."[79]

232.    Defendant also represented in its Privacy Policy that it will always ask for users' permission before sharing their "information with other unaffiliated third parties who are not described elsewhere in this Policy."[80]

---

[79] *Notice of Privacy Practices*, https://www.sondermind.com/notice-of-privacy-practices/.

[80] *Privacy Policy*, https://www.sondermind.com/privacy-policy/.

233.    Defendant's express representations, including, but not limited to, express representations found in its privacy policies, formed and embodied an express contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII and PHI.

234.    Consumers of healthcare value their privacy, the privacy of their dependents and the ability to keep their PII and PHI associated with obtaining healthcare private. To customers such as Plaintiff and Class Members, healthcare that does not adhere to industry standard data security protocols to protect PII and PHI is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security.

235.    Plaintiff and Class Members would not have entered into these contracts with Defendant or its affiliated healthcare providers as a direct or third-party beneficiary without an understanding that their PII and PHI would be safeguarded and protected.

236.    A meeting of the minds occurred, as Plaintiff and Members of the Class agreed to and did provide their PII and PHI to Defendant or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, both the provision of healthcare and medical services and the protection of their PII and PHI.

237.    Plaintiff and Class Members performed their obligations under the contract when they paid for their health care services and provided their PII and PHI.

238.    Defendant materially breached its contractual obligation to protect the nonpublic PII and PHI Defendant gathered when it disclosed that PII and PHI to Google and Meta through the Google and Meta Collection Tools, including the Facebook Pixel, Google Analytics and Google DoubleClick Ads configured on Sondermind's Web Properties.

239.    Defendant materially breached the terms of these express contracts, including, but not limited to, the terms in the relevant privacy policies. Defendant did not maintain the privacy of Plaintiff's and Class Members' PII and PHI as evidenced by Defendant's sharing of that PII and PHI with Google and Meta through the Google and Meta Collection Tools, including the Facebook Pixel, Google Analytics and Google DoubleClick Ads on its Web Properties.

240.    The mass and systematic disclosure of Plaintiff's and Class Members' PII and PHI to third parties, including Google and Meta, was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

241.    As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of the bargain and instead received healthcare services that were of a diminished value.

242.    Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value of the healthcare with data privacy protection they paid for and the healthcare they received.

243.    Had Defendant disclosed that its data privacy was inadequate or that it did not adhere to industry-standard privacy measures, neither Plaintiff, Class Members nor any reasonable person would have purchased healthcare from Defendant or its affiliated healthcare providers.

244.    As a direct and proximate result of the disclosure of Plaintiff's and Class Members' PII and PHI to Google and Meta, Plaintiff and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their PII and PHI, the loss of control and diminution in value of their PII and PHI, the imminent risk of suffering additional damages in the future, disruption of their

medical care and treatment, out-of-pocket expenses and the loss of the benefit of the bargain they struck with Defendant.

245. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the disclosure of Plaintiff's and Class Members' PII and PHI to Google and Meta.

**COUNT III**

**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff & the Nationwide Class)***

246. Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as though fully stated herein.

247. Defendant encourages patients and prospective patients to utilize its Web Properties to review available medical treatments and services, seek out and communicate with medical providers, request and make appointments, pay their medical bills and access their medical information.

248. As described herein, at all relevant times Defendant expressly represented in its Notice of Privacy Practices and Privacy Policy that it will obtain its users' consent prior to disclosing their highly confidential health information to third parties."[81]

249. As a condition of utilizing Defendant's Web Properties and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and Class Members provided their PHI and PII and compensation for their medical care.

37. When Plaintiff and Class Members provided their PHI and PII to Defendant, they trusted that their PHI and PII will be kept secure and will not be disclosed to third party data

---

[81] *See* https://www.sondermind.com/notice-of-privacy-practices/; *see also* https://www.sondermind.com/privacy-policy/.

59

brokers without express consent.

250.     Plaintiff and Class Members entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their PHI and PII without consent.

251.     Plaintiff and Class Members would not have entrusted Defendant with their PHI and PII or retained SonderMind to provide healthcare services in the absence of an implied contract between them and Defendant obligating SonderMind to not disclose their PHI and PII without consent.

252.     Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' PHI and PII without consent to third parties like Facebook and Google.

253.     Defendant materially breached the terms of these contracts including, but not limited to, the terms stated in the relevant privacy policies. Defendant did not maintain the privacy of Plaintiff's and Class Members' PHI and PII as evidenced by Defendant's sharing of that information with third parties such as Facebook and Google.

254.     As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in the contracts. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value of the healthcare with data privacy protection they paid for and the healthcare they received.

255.     As a direct and proximate result of the disclosure of Plaintiff's and Class Members' PHI and PII to Google and Meta, Plaintiff and Class Members have been harmed and have suffered actual damages and injuries including without limitation the release and disclosure of their PHI and PII, the loss of control and diminution in value of their PHI and PII, the imminent risk of

suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

256.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## COUNT IV

### NEGLIGENCE
### *(On behalf of Plaintiff & the Nationwide Class)*

257.    Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

258.    Defendant required Plaintiff and Class Members to submit non-public personal information in order to obtain healthcare services.

259.    Upon accepting, storing and controlling the PII and PHI of Plaintiff and the Class in its computer systems, Defendant owed, and continues to owe, a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their PII and PHI from disclosure to third parties.

260.    Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' PII and PHI arose due to the special relationship between Defendant and its patients, which is recognized by statute, regulations and common law.

261.    In addition, Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

262. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

263. Some or all of the healthcare, medical, or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

264. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

265. Defendant's duty to use reasonable care in protecting confidential data arose also because Defendant is bound by industry standards to protect confidential PII and PHI.

266. Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI from unauthorized disclosure.

267. It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI through its use of the Facebook Pixels, Google Analytics and DoubleClick, and other tracking technologies would result in unauthorized third parties, such as Facebook and Google, gaining access to such PII and PHI for no lawful purpose.

268. Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their PII and PHI.

269. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' PII and PHI; (ii) comply with industry standard data security practices; (iii) implement

adequate website and event monitoring; (iv) implement systems, policies and procedures necessary to prevent unauthorized disclosures resulting from the use of the Facebook Pixel, Google Analytics, Google DoubleClick and other tracking technologies and (v) prevent unauthorized access to Plaintiff's and Class Members' PII and PHI by sharing that information with Google, Meta and other third parties. Defendant's failures and breaches of these duties constituted negligence.

270.    As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' PII and PHI, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

271.    Defendant's wrongful actions and inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' PII and PHI constituted (and continues to constitute) negligence under common law.

272.    Plaintiff and Class Members are entitled to compensatory, nominal and punitive damages, and Plaintiff and Class Members are entitled to recover those damages in an amount to be determined at trial.

273.    Defendant's negligent conduct is ongoing, in that it still holds the PII and PHI of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) cease sharing Plaintiff's and Class Members' PII and PHI

with Google, Meta and other third parties without Plaintiff's and Class Members' express consent; and (iii) submit to future annual audits of its security systems and privacy monitoring procedures.

### COUNT V

**BREACH OF FIDUCIARY DUTY**
**(_On Behalf of Plaintiff & the Nationwide Class_)**

274.   Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

275.   In light of the special physician-patient relationship between Defendant and Plaintiff and Class Members, which was created for the purpose of Defendant providing healthcare to Plaintiff and Class Members, Defendant became guardian of Plaintiff's and Class Members' PII and PHI. Defendant became a fiduciary by its undertaking and guardianship of the PII and PHI, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' PII and PHI; (2) to timely notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

276.   Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with its patients and former patients, in particular, to keep secure their PII and PHI.

277.   Defendant breached its fiduciary duties to Plaintiff and Class Members by disclosing their PII and PHI to unauthorized third parties, including Google and Meta, and separately, by failing to notify Plaintiff and Class Members of this fact.

278.   As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to

compensatory, nominal and punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT VI

### BAILMENT
#### *(On behalf of Plaintiff and the Nationwide Class)*

279.  Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above as though fully stated herein.

280.  Defendant acquired and was obligated to safeguard the PII and PHI of Plaintiff and Class Members.

281.  Defendant accepted possession and took control of Plaintiff's and Class Members' PII and PHI under such circumstances that the law imposes an obligation to safeguard the property of another.

282.  Specifically, a constructive bailment arises when a defendant, as is the case here, takes lawful possession of the property of another and has a duty to account for that property, without intending to appropriate it.

283.  Constructive bailments do not require an express assumption of duties and may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously or by mistake as to the duty or ability of the recipient to effect the purpose contemplated by the absolute owner.

284.  During the bailment, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care, diligence and prudence in protecting their PII and PHI.

285.  Defendant breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiff's and Class Members' PII and PHI, resulting in the unlawful and

unauthorized access to, disclosure and misuse of such Information by third parties such as Facebook and Google.

286.  Defendant further breached its duty to safeguard Plaintiff's and Class Members' PII and PHI by failing to notify them individually in a timely and accurate manner that their PII and PHI had been disclosed to third parties without Plaintiff's and Class Members' knowledge, consent or authorization.

287.  As a direct and proximate result of Defendant's breach of duty, Plaintiff and Class Members have suffered compensable damages that were reasonably foreseeable to Defendant, including but not limited to, the damages set forth herein.

**COUNT VII**

***BIDDLE* CLAIM**
***(On behalf of Plaintiff and the Ohio Subclass)***

288.  Plaintiff re-alleges and incorporates by reference  allegations contained in the paragraphs above as if fully set forth herein.

289.  In *Biddle v. Warren Gen. Hospital*, 86 Ohio St.3d 395, 401 (1999), the Ohio Supreme Court held that an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a medical provider has learned within a physician-patient relationship.

290.  Defendant is a medical provider for Plaintiff and the Subclass.

291.  Through its Web Properties, Defendant received nonpublic medical information from Plaintiff and the Subclass within their patient-physician relationship.

292.  Defendant disclosed that nonpublic medical information to third-parties, including Google and Meta.Plaintiff and the Subclass never consented to the disclosure of their nonpublic medical information to third-parties.

293.  Defendant's unauthorized disclosure of Plaintiff and the Subclass's nonpublic medical information was not subject to any privilege.

294.  Plaintiff and the Subclass have been injured by Defendant's misconduct.

295.  As a direct and proximate result of Defendant's violation of *Biddle*, Plaintiff and Class Members have suffered compensable damages that were reasonably foreseeable to Defendant, including but not limited to, the damages set forth herein.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays for judgment in their favor as follows:

A.  Certification of the Class pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

B.  Designation of Plaintiff as representative of the Class and the undersigned counsel as Class Counsel;

C.  That the Court enter an order:

1.  Preventing Defendant from sharing Plaintiff's and Class Members' PII and PHI among other third parties;

2.  Requiring Defendant to alert and otherwise notify all Users of its Web Properties of what information is being collected, used and shared;

3.  Requiring Defendant to provide clear information regarding its practices concerning data collection from the Users of Defendant's Web Properties, as well as all uses of such data;

4.  Requiring Defendant to establish protocols intended to remove all personal information which has been leaked to Facebook, Google and other unauthorized third parties, and request Facebook, Google and other third parties to remove such information;

5.  Requiring Defendant to provide an opt out procedures for individuals who do not wish for their information to be tracked while interacting with Defendant's Web Properties;

6.  Mandating the proper notice be sent to all affected individuals and posted publicly;

7. Requiring Defendant to delete, destroy and purge the PII and PHI of Users unless Defendant can provide reasonable justification for the retention and use of such information when weighed against the privacy interests of Users;

8. Requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted.

D. Awarding Plaintiff and the Class Members damages (both actual damages for economic and non-economic harm and statutory damages) in an amount to be determined at trial;

E. Awarding appropriate equitable and any other relief (including monetary damages, restitution and disgorgement) against Defendant to which Plaintiff and the Class are entitled, including but not limited to restitution and an Order requiring Defendant to cooperate and financially support civil and criminal asset recovery;

F. Awarding Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

G. Awarding Plaintiff and the Class reasonable attorneys' fees and costs of suit incurred by their attorneys;

H. Awarding Plaintiff and the Class treble and punitive damages insofar as they are allowed by applicable laws; and

I. Granting any and all other such relief as the Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff, individually on behalf of herself and the Class, demands a trial by jury of any and all issues in this action so triable of right.

Respectfully submitted,

Dated: October 17, 2025                    */s/ Jared W. Connors*

Matthew R. Wilson (72925)
Jared W. Connors (101451)
**MEYER WILSON WERNING CO., LPA**
305 W. Nationwide Blvd.
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066
Email: mwilson@meyerwilson.com
        jconnors@meyerwilson.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Ph: (708) 437-6476
david@almeidalawgroup.com

Brandon M. Wise*
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
One US Bank Plaza, Suite 1950
St. Louis, MO 63101
Ph: (314) 833-4825
bwise@peifferwolf.com

Andrew R. Tate*
**PEIFFER WOLF CARR**
**KANE CONWAY & WISE, LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Ph: 404-282-4806
atate@peifferwolf.com

* to seek admission *pro hac vice*

*Attorneys for Plaintiff & the Putative Class*

69